CASE 57—PETITION EQUITY—DECEMBER 6.

## Thurber v. Crump.

APPEAL FROM LOUISVILLE CHANCERY COURT.

1. TRANSFERS OF STOCK IN CORPORATIONS organized under chapter 56 of the General Statutes, are valid, not only between the parties, but as against creditors, although not entered upon the books of the company. The provision of the statute requiring such transfers to be made upon the books of the company is for the protection of the corporation and purchasers, and not for the protection of creditors of the stockholders, the books of the company not being open to the inspection of the public.

2. BONA FIDE PURCHASER.—A purchase of stock in a corporation, which was attacked in this case as fraudulent, is held to have been a *bona fide* transaction, the circumstances of the purchase being set forth in the opinion.

BROWN, HUMPHREY & DAVIE FOR APPELLANT.

1. The certificates of stock being in the actual possession of Wilson and in his name, Thurber was justified in dealing with him as the true owner, and got good title by his purchase thereof; and upon so obtaining them, had the right to demand their transfer to him on the corporation books.

2. Even conceding that Crump had a contract with Wilson by which Crump was to be the one-half owner with Wilson of the stock in the corporation obtained by Wilson; still Crump having, with full

knowledge of the issue of the stock to Wilson, failed to make his claim for any share thereof, or to enter a caveat with the corporation against its transfer, must be held junior in equity to the *bona fide* purchaser, Thurber.

3. The eleventh section of chapter 56 of the General Statutes, relied upon by the appellee, cannot avail him; for the reason that the negative words of that section, to-wit, "transfers of stock shall not be valid except as between the parties thereto until the same are regularly entered upon the books of the company, so as to show the name of the person by and to whom the transfer is made;" must, by every reasonable construction, import that as between the parties to the contract as to the stock, the question of title cannot be affected by the non-appearance of the transfer on the books of the company. The title of Wilson did pass to Thurber, and Wilson was concluded by the transaction. (Railroad Co. v. Schuyler, 34 New York, 30.)

4. Crump had no specific equity or claim upon these specific shares of stock; but merely a general floating claim on such surplus of Wilson's stock as should exceed his profits in certain transactions. Thurber's right, therefore, is specific, and Crump's equity, if any he have, is a mere floating equity.

5. The opinion rendered by the Circuit Court of the United States for the District of Kentucky, although it has been set aside because of the improper removal of this cause into that court, is entitled to the consideration which the dignity of that court and the force of its argument demand. Corroborative of the conclusions there reached, are the cases of Righter v. Forester, 1 Bush (Ky.), 278; Low v. Blincoe, 10 Bush (Ky.), 331; and Finley. v. Spratt, 14 Bush (Ky.), 225.)

6. The attack upon the credibility of Thurber is totally refuted by the checks which he filed, bearing Wilson's indorsement, and sustaining fully his account of the transaction.

EMMET FIELD FOR APPELLEE.

When a general statute prescribes the manner in which stock is to be transferred, a purchaser can not acquire title, as against the creditors of the vendor, unless the transfer is consummated in the manner directed by the statute, before the creditors acquire rights against the stock. (Gen. Statutes, chap. 56, sec. 11; 5 Gray, 373, Fisher v. Essex Bank; 49 Maine, 318, Skowhegan Bank v. Cutter; 29 Conn., 253, Shipman v. Ætna Ins. Co.; 20 California, 529, Noglee v. Pacific Wharf Co.; 3 Lea, 6, Carrick v. Richards; 6 Mo. App., 454, Merchants' Nat. Bank v. Richards; 52 N. Y., 208, Johnson v. Underhill 51 Wis., 522, Application of Thos. Murphy; 3 Paige, 360, Stebbins v. Phœnix Ins. Co.; 42 N. H., 424, Pinkerton v. Railroad.)

JUDGE BENNETT DELIVERED THE OPINION OF THE COURT.

The appellee, on the twenty-sixth day of November, 1880, filed his petition in the Louisville Chancery Court against James Wilson and the Southern Dairy Company. In his petition he alleged, in substance, that he made a verbal contract with James Wilson, by which he agreed to assist him, Wilson, in selling the right to manufacture, in the States of Kentucky and Indiana, animal fats for the purposes of food in the form of butter, etc. That the right to manufacture animal fats, etc., in these two States was secured by patent, which patent Wilson owned. That, by the terms of the agreement, Wilson was to receive twelve thousand dollars for the right to manufacture under his patent, for the State of Kentucky, and all over that sum received by Wilson for the right to manufacture, in the State of Kentucky, the appellee was to have one-half of it as compensation for his services. That Wilson was to receive eight thousand dollars for his right to manufacture, under his patent, for the State of Indiana, and all over that sum received by Wilson for the right to manufacture, in the State of Indiana, the appellee was to have one-half of it as compensation for his services.

The appellee alleged that he did materially aid in getting a company organized and incorporated under the incorporation law of this State, in the city of Louisville, which company was styled the "Southern Dairy Company of Louisville." That by his aid, Wilson was enabled to sell his patent right for the State of Kentucky to the Southern Dairy Company for five hundred shares of stock in said company, each share

Thurber v. Crump.

being for one hundred dollars. That afterwards he aided Wilson in selling to said company his patent right for the State of Indiana for five hundred additional shares of stock in said company, each share being for one hundred dollars. That Wilson sold, before the certificate of stock on his Kentucky sale was issued to him, one hundred of said shares, for which he received five thousand dollars; and that the company's certificate of stock was issued to him for the remaining four hundred shares. That the company issued to Wilson certificates of stock for five hundred shares on account of the Indiana purchase. Appellee alleged that Wilson had realized more than twelve thousand dollars from the stock issued to him for the Kentucky purchase, and more than eight thousand dollars from the stock issued to him for the Indiana purchase. That after the sale of stock enough to realize said sums of money, a large amount of stock still remained upon the book of the company in the name of Wilson, and was held by him. He alleged that he was entitled to one-half of this stock; but Wilson refused to surrender the same to him. Having made the Southern Dairy Company a defendant, he asked that it be compelled to cancel the certificates of one-half of the stock remaining on its books in the name of Wilson, and issue new certificates to him for the same. The Southern Dairy Company on the fourth day of February, 1881, filed its answer, in which it stated that there remained on its stock-books, in the name of Wilson, two hundred and fifty shares of its stock; but that the company had been informed that Wilson, on the twenty-sixth

of October, 1880, had transferred the certificates of said shares to the appellant, Thurber, and that Thurber had demanded that a transfer of the stock be made to him; but the stock still remained in the name of Wilson, and that the company was willing to transfer it to whom the court might order it transferred. The appellee then filed an amended petition, in which he alleged that the appellant, Thurber, had never paid any value for the stock; and that the transfer of the certificates had never been made to him, or, if the transfer had been made to him, it was done after he had instituted his suit. Afterwards, the appellant appeased and filed his answer, in which he alleged that he purchased said stock in the city of New York, on the twenty-sixth of October, 1880; that the purchase was made for value, in good faith, and without any knowledge or information of the appellee's alleged claim. He also alleged that the certificates of stock were delivered to him by Wilson at the time of purchase. The appellee, in his reply, put in issue the appellant's allegations, and attacked the *bona fides* of the alleged purchase.

The lower court adjudged that the appellee was entitled to the two hundred and fifty shares of stock; but inasmuch as the appellant had disposed of the stock since the institution of the appellee's suit, the court rendered judgment against the appellant for its value, to-wit, one hundred and seven dollars per share. The court's judgment was based upon the fact that the appellant was not a *bona fide* purchaser of the stock. So, the first question to be determined is, does the evidence in the case sustain the conclusion

reached by the lower court, to the effect that the purchase of the stock was not *bona fide?*

The appellant gave two depositions in the case. His first deposition was given in November, 1881. In this deposition he swears that he purchased this stock from James Wilson on the twenty-sixth of October, 1880; that he paid fifteen thousand dollars cash for it, which sum was its market value; that he was unable to tell whether the payment was by check, but it was a cash transaction; that the purchase was made in good faith, and without any knowledge or suspicion that the stock did not belong to Wilson; that he took an assignment of the certificates of stock at the time he made the purchase; that thereafter he made a demand of the Southern Dairy Company to have the stock transferred on the book of the company in his name. It appears from other facts in the record that this demand was made the first of February, 1881. The appellant gave his second deposition in December, 1885. In this deposition he says that, at the time of his purchase of this stock, he was engaged in the wholesale grocery business, in the city of New York, as a member of the firm of H. K. & F. B. Thurber, which firm did a yearly business of about eighteen or twenty millions of dollars. That James Wilson was at that time largely interested in the oleomargarine business, and was managing the Commercial Manufacturing Company in New York. That his, appellant's, firm sold all the products of Wilson's firm; in that way there were large dealings between the two firms. That Wilson and himself had individual dealings with each other, consisting mostly, if not wholly, of money transactions,

such as loaning him, Wilson, money, discounting his notes, and effecting loans for him. That on or about the fourth of September, 1880, he loaned Wilson fif-teen thousand dollars, and took as collateral security for the same some stock which Wilson owned in the Commercial Manufacturing Company of Chicago ; that this fifteen thousand dollars was paid to Wilson by two checks, in the name of the appellant's firm. One of the checks was given on the fourth of September, 1880, and for fifteen hundred dollars ; the other check was given on the eighth of September, 1880, for thirteen thousand four hundred and eighty-five dollars ; both checks were drawn on the Importers and Traders' National Bank. That Wilson owed him a balance of fifteen dollars, which sum made up the fifteen thousand dollars. He says that after giving Wilson these checks in the name of the firm, he credited Wilson on the books of the firm with the amount of the checks, and he settled the amount with the firm. He explains why he did not give a detailed account of the transaction in his first deposition, which is, that having given the checks in the name of the firm, he was unable, until some time afterwards, to trace the checks to this trans-action.

Appellant's testimony, as given in his second deposi-tion, certainly does not contradict his evidence as given in his first deposition. In his second deposition he details the history of the transactions between Wilson and himself that culminated in the purchase of the stock, which transactions show, as stated in his first deposition, that the purchase of the stock was really for cash. In other words, the purchase was, in fact, a

cash transaction. The appellant's evidence is the only evidence of this transaction. He is not contradicted as to the transaction, in any particular, by other evidence. It is true, there appears in his evidence some discrepancies upon minor and collateral points; but taking his first deposition upon the subject of the purchase, and the circumstances given in his second deposition, that led to the purchase, we are constrained to the conclusion that his evidence, as to the transaction, is not contradictory. We cannot discredit the appellant's evidence, as to the *bona fides* of the purchase, upon the ground that he, in the light of other evidence, was mistaken in his recollection as to the *bona fides* of the transaction; but if he is to be discredited, it must be upon the ground that he has committed perjury. We think the evidence does not justify such a conclusion.

Before discussing the question of the legal right of the appellant to the stock, it is necessary to determine how Wilson held it, whether in his own right or not.

First. The appellee's evidence shows clearly that the stock was issued to Wilson with appellee's knowledge and consent; that, in a word, the stock was to stand on the company's stock books in the name of Wilson, and the certificates of stock were to be issued to Wilson.

Second. That the appellee was to have one-half of all that might be realized over twelve thousand dollars on the sale of the patent right for Kentucky, and one-half of all that might be realized over eight thousand dollars on the sale of the patent right for the State of Indiana; that the agreement clearly contemplated a money transaction between the appellee and Wilson.

So, on the twenty-sixth of October, 1880, James Wilson was the legal owner of this stock; the appellant purchased the stock from him at its market value and without notice of the appellee's claim, and took an assignment of the certificates of stock. These certificates were not presented to the Southern Dairy Company to be canceled, and the stock entered in the name of the appellant, until after the appellee brought this action. So the question arises, what title did the appellant acquire by his purchase and the transfer of the certificates?

The Southern Dairy Company was organized under chapter 56 of the General Statutes. The eleventh section of this chapter reads as follows: "Transfers of stock shall not be valid, except as between the parties thereto, until the same are regularly entered upon the books of the company, so as to show the name of the person by whom and to whom the transfer is made, the number or other designation of the shares, and the date of the transfer. The books of the company shall be so kept as to show intelligibly the original stockholders, their respective interests, the amount which has been paid thereon, and all transfers thereof. And such books, or correct copies thereof, so far as they relate to the items mentioned in this section, shall be subject at all times to the inspection of any stockholders desiring the same."

By this section Wilson was not denied the right to transfer his stock in the company. By the common law, his stock being personal property, he had the right to sell it at private sale and pass a perfect legal title to it, which sale, upon delivery of the stock itself, if sus-

Thurber v. Crump.

ceptible of manual delivery, if not, upon the delivery of the certificates—a symbolical delivery—would pass the legal title to the vendee, which title would prevail against any prior lien upon the stock or executory contract for the sale of it, of which the vendee had no notice, which sale would also prevail against any subsequent sale or transfer of the same stock. So far, therefore, as the statute treats the transfer of stock, as between the vendor and vendee, as valid, it is simply declaratory of a common law principle. This common law principle is unrestrictive of the right of the owner of stock to sell it at private sale and pass a perfect legal title to it. James Wilson was the legal owner of the stock ; the absolute legal title was in him ; when he sold it to the appellant, he parted with all the title that he had ; he had the legal title and he sold that title ; there was nothing left for him to do concerning the transfer. All the title that he had vested in his vendee. It is well-settled that when a person makes an absolute sale of property, to which he has a legal title, the legal title passes to the vendee, subject, however, to such restrictions as our registration laws may put upon such transactions for the protection of innocent purchasers, etc. Even when the registration laws require that certain conveyances, to be valid as against innocent purchasers and creditors, without notice, must be recorded, such sales, as between the vendor and vendee, pass the legal title ; for the reason that the vendor has the legal right to sell the property, and when he owns the legal title and sells it, he passes all that he has ; there is nothing left for him to do, in order to pass his title ; for the purchaser has all his right in the property.

So in this case, Wilson sold the stock to the appellant; he parted with all the title he had, which was the legal title; there was nothing left for him to do to perfect that title in the appellee. The Southern Dairy Company was not a joint owner of this stock. This company had no legal or equitable title to it. Wilson was a member of the company—one of the incorporators—and by the terms of his membership this stock was to be free from assessments; he held his stock not in common with his brother members, but in his own absolute right; so the appellant was not compelled to look to the company in order to get it to relinquish any legal or equitable title that it might hold to the stock; for it held neither legal or equitable title to it. The appellant, then, by his purchase, acquired Wilson's title to the stock; the company owned no legal or equitable title to it, nor did any one else. It follows, therefore, that the appellant, as between Wilson and himself, acquired the legal title to the stock, and, according to common law principles, he acquired the legal title as against all the world.

But according to the eleventh section of the statute, the "transfers of stock shall not be valid, except as between the parties thereto, until the same are entered upon the books of the company," etc. This provision was certainly made for the protection of the corporation and purchasers, but not for the protection of the creditors of the stockholders. It is but right that the company should know, at all times, who its stockholders are; their right to vote; their right to draw dividends; their right to shape and control the destiny of the company, in the prosperity and welfare of which each mem-

ber has a direct interest; the protection of the company against paying dividends to the wrong person; the protection of the company against conflicting claimants of the stock; the risk of paying dividends or other emoluments to illegal claimants; the risk they would run in recognizing the rights of claimants who held conflicting private transfers of stock from the same stockholder— these reasons, doubtless, caused the insertion of the provision requiring that transfers of stock, in order to be valid as against the company, should be transferred on the books of the company.

So, also, as said above, but for the restriction in the eleventh section, a purchaser of stock from the stockholder would acquire a perfect legal title to the stock as against antecedent liens and purely executory rights of third persons, of which the vendee had no notice; also his purchase would prevail against subsequent purchasers; and as the statute does not require that the transfer of the stock shall be made only by a transfer of the certificate of stock, but as the transfer may be made by any writing, and as it is within the power of the owner of the stock to sell it to different persons, it was, therefore, also intended that the said section of the statute *supra* should have the effect of a registration law as between conflicting purchasers of stock from the same person, and to provide that the right of the junior purchaser should prevail against the right of the senior purchaser, provided the junior purchaser should succeed in having his transfer entered upon the books of the company first, and without notice of the senior purchase.

But the section *supra* does not operate as a registra-

tion law in the interest of the creditors of the stockholder, for the reason that the books of the company are not required to be kept open for the inspection of the public. The books are required to be kept open to the stockholders only; outsiders have no right to demand an inspection of the books; therefore, the section in question was not intended for the protection of creditors. As to the creditor, the stock of the stockholder is as though the stockholder held it in his pocket on some private individual, in which case a *bona fide* transfer for value is good against the transferrer's creditors. So in the case at bar, the recording of the transfer of stock on the books of the company not being required for the benefit of the stockholder's creditors, but for the benefit of the company and purchasers, the transfer of the stock, without the transfer being entered upon the books of the company, limited the passage of the legal title strictly to the vendor and vendee as between the vendee and the company and a subsequent purchaser for value, without notice of the prior purchase at the time he had his transfer recorded on the books of the company; but as between such purchaser and the creditors of the stockholder, the purchaser acquires a perfect legal title. (New York & New Haven R. R. Co. v. Schuyler, 34 N. Y., 30; Lowell on Transfer of Stock, sections 93, 95, 96.)

The judgment of the lower court is reversed, and the case is remanded with directions to dismiss the appellee's petition.