## Hays' Administrators v. Patrick

(Decided Dec. 15, 1936.)

HERSCHEL T. SMITH and NANCY DAY MONTGOMERY for appellants.

J. D. VIA and F. B. MARTIN for appellee.

OPINION OF THE COURT BY JUDGE RATLIFF—Reversing.

Pete R. Hays died intestate, a resident of Hickman

county, Ky., on March 22, 1934, 86 years of age, and had never been married. He left no brothers or sisters, but left a number of nephews and nieces. He left personal property of the approximate value of $30,000 and three or four farms, but the value of the farms is not shown.

In January, 1930, Hays purchased four Sewer Improvement bonds of the city of Paducah—two for the sum of $1,000 each which matured July 1, 1934, and one for $500 which matured at the same date, and one for $500 maturing July 1, 1936, with interest coupons thereto attached.

Soon after the death of Hays, J. R. Graham and D. B. Graham were appointed administrators of his estate and went to the Bank of Clinton to make an inventory of his personal estate and found the four Paducah bonds in an envelope separate from the other bonds, securities, etc., of the deceased, with the name of appellee, "U. W. Patrick," written on the envelope and also the words "Paducah Street Improvement Bonds." They were informed by Reuben Griffey, an employee of the bank, that Patrick claimed that Mr. Hays had given him the bonds more than four years previous to his death and Patrick claimed to be the owner of same. The administrators agreed for Griffey to retain the bonds in his possession until the owner thereof was determined, and soon thereafter the administrators brought this suit in the Hickman circuit court to recover the bonds. Patrick filed his answer in which he denied that Hays was the owner of the bonds in question at the time of his death, and further pleaded that more than four years before the death of Hays, he (Hays) of his own volition, and without any coercion or fraud upon the part of the defendant, made to the defendant an absolute gift of the bonds, and at the time of the gift he made absolute and complete delivery of them to the defendant, and since that time said bonds have been in the possession of defendant as his own property. He further alleged that at the time of the delivery of the bonds to him, Hays released all title to and control over them and recognized same as being the absolute property of the defendant, and at said time the decedent was capable both mentally and physically of making delivery and the transaction, and had mind and memory sufficient to know what he was doing and to know the value of his property and his obligations to his relatives. He also alleged that at the time of the gift and since said time

he was the acting vice president of the Bank of Clinton, Ky., and the decedent transacted all his business through said bank and depended upon defendant to transact his business, and that he did transact all his business over a period of years, and that the value of the bonds including interest is less than the value of the services rendered by him to the decedent.

The appellants, plaintiffs below, moved the court to strike certain words from the answer which motion was overruled, but so far as the record discloses no reply was filed or other order entered of record traversing the affirmative allegations of the answer, though it is said in brief the order was made. However, it does not appear that any question was made by the defendant in regard thereto and the case was practiced to a conclusion as though the issues had been properly made and was so treated by the parties and the trial court. The case was tried before a jury and resulted in a verdict and judgment thereon for the defendant, and to reverse that judgment the administrators have brought this appeal.

Plaintiffs filed their motion and grounds for a new trial, insisting that the court committed the following errors: (1) In refusing to grant their motion for a peremptory instruction at the close of the evidence; (2) in its ruling on the admission of evidence; (3) the instructions were erroneous; (4) in refusing instruction B offered by plaintiffs; and (5) because the verdict is contrary to the law and flagrantly against the evidence.

Patrick did not testify concerning the transaction between himself and the deceased relating to the gift of the bonds, but testified, in substance, that he came to Clinton about the year 1914 and had been a customer and stockholder of the Clinton Bank for many years previous to the year 1930, when he became acting vice president of the bank, and Mr. Hays was also a customer of the bank, and that he (Patrick), after he became vice president of the bank, transacted some business for him and most generally waited upon him when he would be transacting his banking and, perhaps, other business at the bank. He also said that they were friends and became such shortly after they became acquainted, but we do not gather from his testimony with reference to the friendly relations between them that they were any stronger than what the record shows existed be-

tween Mr. Hays and others of his acquaintance; nor were they more than what is usual between individuals well acquainted with each other and between whom there exists confidence. The testimony of defendant with reference to such matters was objected to, but overruled with exceptions. The plaintiffs (the two administrators) testified that within a short time after their appointment they had a conversation with defendant with reference to the bonds, in which he claimed that the decedent had given them to him, but it is not stated that he then explained how it was done; but he did state to them that he (defendant) had no writing showing or evidencing the gift, and that "he requested him [decedent] to make a will and will him [defendant] the bonds * * * and Uncle Pete refused to do it." In rebuttal defendant was interrogated concerning that testimony and was asked if he made that statement, and he answered:

"The best I remember I told them I tried to get Uncle Pete to make a will.

"Q. Did you tell them you tried to get Uncle Pete to make a will willing you the bonds? A. No, sir, *I don't think* I did."

Reuben Griffey, the cashier of the bank at the time involved, was then introduced by defendant, and, since his testimony is the only proof heard to establish the alleged gift, we have concluded to insert all of its material parts bearing upon that transaction, omitting therefrom objections thereto and the ruling of the court thereon:

"Uncle Pete came in and walked around and came through a little private room there and asked for Mr. Patrick or probably didn't ask because it was always understood when he would come in that he wanted Patrick to wait on him. When he came in he sat down at the chair which was his custom and Mr. Patrick went in and got some papers out of the safe and brought them back and clipped the coupons and was doing something with the bonds there at the desk inside. I was busy over at the other desk, just normal business you know, and Mr. Patrick left Uncle Pete, which we always call him, and walked away from that desk to where I was and said 'Uncle Pete gave me these bonds.' And he put them in an envelope.

"Q. Who put them in an envelope? A. Patrick reached over there in a pigeonhole and got an envelope and put the bonds in them and walked back to the desk where Uncle Pete was.

"Q. Now Mr. Griffey, when Mr. Hays come in and sat down Patrick got his papers? A. Yes, sir.

"Q. And walked to the desk where Uncle Pete was? A. Yes, sir.

"Q. And both sat there? A. Yes,. sir.

"Q. Do you know how long they sat there? A. I couldn't say the time.

"Q. I believe you say they were doing something with the bonds—clipping coupons? A. Yes, sir.

"Q. Did I understand you to say Patrick got up and walked to where you were? A. Yes, sir.

"Q. Were there any envelopes kept where you worked? A. Yes, sir.

"Q. Where were they kept? A. In a hole under window.

"Q. What did Patrick do with reference to the hole in the window? A. He reached under there and got an envelope and put these bonds in it.

"Q. What else, if anything, did Pat do about the envelope? A. He wrote on it.

"Q. How close were you to Pat when he was doing that? A. I stepped it off at the other trial and it was about four steps.

"Q. Do you mean from where he got the envelope? A. Yes, to where Uncle Pete was setting.

"Q. You were about four steps from him? A. Yes, sir, and the pigeonhole was right beside me.

"Q. If I understand you the transaction you have related occurred within four steps of Uncle Pete? A. Yes, sir.

"Q. He was setting at the desk while Pat put the bonds in the envelope and was writing on it, is that right? A. Yes, sir.

"Q. Was he close enough to hear and see what was going on? A. I think so.

"Q. When Pat put the bonds in the envelope what did he do and where did he go? A. Back to the desk where Uncle Pete was.

"Q. And sat down there? A. Yes, sir.

"Q. How long did he stay there? A. I couldn't answer the exact time, but he would usually set in probably a few minutes. Little while, might be thirty I couldn't say.

"Q. After they transacted their business tell what became of the papers they had on the desk? A. Well the liberty bonds—

"Q. I mean all the papers Uncle Pete and Pat had? A. They were put in the safe."

He stated that he did not remember the date, but that it was between the first of the year 1930 and the spring of that year, and that thereafter the decedent would come in the bank and look over his papers occasionally, but that the interest on the bonds was payable semiannually. Therefore, having been issued on January 18, 1930, the first semiannual interest would not be due and payable until in July of that year. He furthermore said that on the occasions that Mr. Hays came into the bank and when he would look at his papers Patrick would most usually take them from the safe and present them to him, but witness never testified that the decedent ever saw or read what was on the envelopes containing the involved bonds (which was Patrick's name written by himself, together with the designation of the securities), nor does he claim that he ever saw the envelope presented to or in the hands of the decedent. He also testified positively that the decedent during the remainder of his life (four years) never mentioned the fact of the alleged gift to him or in his presence, nor did he (witness) ever mention it to any one, while other testimony in the case (by at least two witnesses) was to the effect that up to within a month before decedent died he stated that he owned some Paducah bonds, and there is no proof in this case that he ever had any such bonds except the ones involved in this litigation. That claim of decedent was made in February, 1934, preceding his death in the following March. Before that date, and some time in 1933, he made a similar statement to another witness. Griffey also stated that the activities or services of defendant toward the decedent to which he testified were rendered

after defendant became connected with the bank, which was at the beginning of 1930, and which, of course, had not long continued before the transaction resulting in the alleged gift.

Witness also stated that ''I heard Uncle Pete say when Patrick walked back to the desk where they were that he wanted the interest'' on these bonds, but what bonds he had reference to was not disclosed by the witness, and it was perfectly natural that the decedent, who owned other bonds in his package, desired to collect the interest due thereon. But there could not be any due on the bonds in controversy, since the first semiannual period for interest had not arrived. So that, when he (decedent) in that alleged statement referred to ''these bonds'' he could not have referred to the ones in controversy. The witness also, in answer to very leading questions, stated in substance that after the transaction described the defendant ''exercised control and dominion over the bonds,'' and which answer was made over the objections and exceptions of plaintiffs because the witness expressed only a conclusion, and which conclusion was not sustained by the actual facts developed by other testimony introduced.

There are other proven facts in the case proving a determination to veil the transaction with secrecy, but which we deem it unnecessary to relate. As stated, the testimony of Griffey constitutes the *only* proof heard to sustain defendant's claim of a gift, and we are convinced that it was entirely insufficient for that purpose. An analysis thereof shows that every act and every word going to establish the alleged gift transaction was taken, made, and spoken by the donee of the gift—the donor saying nothing and doing nothing, except to keep his seat at the desk where he was sitting while engaged in looking at some of his other papers, whilst the gift factory was in operation twelve feet away from him and the defendant was the exclusive operator thereof. The theory of his counsel is that the decedent *heard* what defendant stated to Griffey at the latter's desk twelve feet away from the place where he was sitting and while he was most probably absorbed in looking over his other securities; and that he then said nothing, thereby, as counsel infers, consenting to and agreeing with defendant's statement to Griffey concerning the gift and which completed it beyond decedent's recall. To make that theory effective the court *must* conclude that decedent

*did* hear the statement, notwithstanding the absence of any testimony to show the tone of voice employed by defendant when he made the statement to Griffey, i. e., whether it was loud or low, or whispered or shouted. The only testimony in the case remotely bearing upon the fact as to the probability of decedent having heard that statement was the answer of Griffey to this question:

"Was he close enough to hear and see what was going on? A. *I think so.*"

That, of course, was the witness' surmise or guess and we can make no more out of it. If decedent did not hear that statement, then the whole structure upon which the alleged gift rests falls to the ground, since there is no other testimony in the case remotely supporting it. On the contrary, there is the statement (not positively denied by defendant) that he (defendant) tried to get decedent to make a will devising him the bonds but he would not do it. If decedent had heard the remarks and by his silence had agreed thereto—upon which the theory of counsel exclusively rests—he surely could have had no objections to evidencing that fact, by either a will or some other writing. Moreover, the mere making of that request by defendant was a fact showing that he entertained doubts of his title to the bonds and wanted the evidence thereof to be more secure, but Mr. Hays declined to accommodate him.

The law with reference to what is necessary to establish an inter vivos gift is well settled, and the statement of it is quite uniform in all text-writers upon the subject as well as the expressions of courts in this and other jurisdictions. Four comparatively recent cases from this court declaring, approving, and applying such requisites or necessities are Hale v. Hale, 189 Ky. 171, 224 S. W. 1078, 1079; Combs v. Roark's Adm'r, 221 Ky. 679, 299 S. W. 576, 578; Moore's Adm'r v. Edwards, 248 Ky. 517, 58 S. W. (2d) 915; and O'Brien's Adm'x v. Murray, 258 Ky. 140, 79 S. W. (2d) 414. In the Hale Case it was said that to complete a gift " 'there must be an intention [by the donor] to transfer title to the property, as well as a delivery by the donor and an acceptance by the donee. Mere intention to give without delivery is unavailing and delivery is insufficient unless made with an intention to give.' * * * It is equally true that, since gifts of this character [inter vivos] furnish a

ready means for the perpetration of fraud, the evidence necessary to establish all of the essentials to complete them must be clear and convincing.'' The case cites many cases, among which are Stark v. Kelley, 132 Ky. 376, 113 S. W. 498; Foxworthy v. Adams, 136 Ky. 403, 124 S. W. 381, 27 L. R. A. (N. S.) 308, Ann. Cas. 1912A, 327; Taylor v. Purdy, 151 Ky. 82, 151 S. W. 45; and Goodan v. Goodan, 184 Ky. 79, 211 S. W. 423.

In the Roark Case we said on the same subject:

"As a gift is a parting by the owner with his property without pecuniary consideration, the law scrutinizes such transactions very closely, and to establish such a gift there must be a donor competent to make it, and an intention on his part to make it; a donee capable of taking a gift; the gift must be complete with nothing left undone; the property must be delivered by the donor, must be accepted by the donee, must go into immediate and absolute effect, must be gratuitous, and, in the case of gifts inter vivos, must be irrevocable."

See also Downing v. Whitlow, 211 Ky. 294, 277 S. W. 262. In 28 C. J. 679 this statement was made:

"The mere possession of the property by the donee is not sufficient evidence of a gift, for this may be consistent with a mere custody or agency."

In the Roark opinion, in speaking upon the quantum of proof, as well as its quality, to establish a gift, we said:

"The evidence must be so cogent, * * * as to leave no reasonable doubt in the mind of an unbiased person that the demand is a proper one."

Such undeviating requirements are doubly true where the gift is first asserted after the death of the donor, and likewise more emphatically true where there exists confiidential relations between the donor and donee. With the law as so universally declared, can it be said with any degree of accuracy that the proof in this case measured up to such requirements? The answer must necessarily be a negative one. We have already pointed out that the whole structure of defendant's theory rests upon the extremely doubtful surmise as to whether or not the donor in this case, Mr. Hays, heard the announcement of the alleged gift made by defendant to Griffey, but which the undisputed facts and circumstances show was extremely improbable and the ac-

tions of the parties thereafter fortifies that improbability. However, if he had heard it, it would by no means follow that he intended by his silence to divest himself of $3,000 of property and to transfer his title thereto to another, the defendant. He may have concluded—if he did hear the statement made by defendant to Griffey—that it was no more than what is expressed in ordinary slang as "joshing," and that it was not intended to be serious so as that his silence with reference thereto would convert it into an actuality. Surely, such testimony is far removed from the requirement that it be "so cogent as to leave no reasonable doubt in the mind of an unbiased person that the demand is a proper one." To sustain defendant's contention we would be compelled to hold that one may become the donor of a gift to another by not speaking a word, not performing an act indicating his intention and purpose to divest himself of ownership of the property, and that too in the absence of any element of estoppel which was not pleaded in this case, nor was there any evidence to support it, nor any room for its application.

A more extended elucidation of the testimony heard at the trial would no doubt serve to substantiate the conclusions reached, but it is deemed unnecessary, since what we have pointed out is abundantly sufficient to show that the alleged gift in this case was not proven by the high standard of testimony required in such cases—even if the statements of defendant concerning the gift, that he made to Griffey at the time, were competent, which is extremely doubtful. The sole ground for the admission of defendant's statement or declaration to Griffey is because it was competent under the res gestæ doctrine, but if it was made near enough to the principal fact, and in circumstances otherwise rendering it competent under that doctrine (which is also doubtful), still the fact is that the declarant, whose res gestæ statements were proven by Griffey, was an incompetent witness to testify in person to such declared facts, and it would be a twisted rule of logic that would close his mouth to repeat to the jury his statements to Griffey and at the same time allow Griffey to tell what the incompetent witness told him. But because of the conclusions above reached we will defer passing on that question, since accepting the competency of the testimony it is then lacking in sufficient probative force to grant defendant the relief he seeks.

The court, therefore, erred in overruling plaintiffs' motion for a directed verdict, and the judgment is reversed, with directions to set it aside, to grant a new trial, and for proceedings consistent with this opinion.

Appellants' petition for rehearing is sustained; the former opinion is withdrawn, and the judgment is reversed.

The whole court sitting.