## Farris et al. v. Farris et al.

(Decided June 25, 1937.)

NELSON D. RODES and HENRY JACKSON for appellants.

ADD LANIER, C. C. BAGBY, J. W. HARLAN, LANIER & HARLAN and E. C. NEWLIN for appellees.

OPINION OF THE COURT BY JUDGE CLAY—Affirming.

On March 29, 1923, M. J. Farris, then 77 years of age, a widower, married Zillah Dawes Farris, then 31 years of age. A few days prior to the marriage the parties entered into an antenuptial contract by which it was agreed that Zillah Dawes, should she survive M. J. Farris, should receive out of his estate bonds of the value of $25,000 at the date of his death, in full satisfaction of her marital rights in his property. At the time of the second marriage, Mr. Farris had an unmarried adult son, Maurice J. Farris, Jr., who lived with him until his death in March, 1934. Long prior to his second marriage, M. J. Farris had transferred a large portion of his estate to his son, who, on his death, left his estate in trust to him during his lifetime. It is admitted that Mr. Farris was one of the leading citizens of the community, and a man of high character and fine attainments, whose mind was clear until the date of his death. He was a devoted member of, and a generous contributor to, the Baptist Church in Danville, and helped young men to obtain an education. He also displayed a warm interest in his nephew, Maurice J. Farris, county judge of Boyle county. Some time after their marriage, Mr. Farris gave to Mrs. Farris two small houses in Danville, and later on his automobile and

household effects. The home in which Mr. and Mrs. Farris lived belonged to the trust estate, and was to be sold on his death, and several times during his last days Mr. Farris spoke of buying a lot on which Mrs. Farris could build a home.

On Saturday, November 17, 1934, Mr. Farris suffered a partial stroke of paralysis. On the following Monday morning Mrs. Farris telephoned Mr. Nelson D. Rodes who had been Mr. Farris' attorney for a number of years, that Mr. Farris desired to see him at his home. When Mr. Rodes reached the Farris home, he found Mr. Farris sitting up and fully dressed. Though Mr. Farris appeared to understand what he was doing, Mr. Rodes had some difficulty in understanding what Mr. Farris said. Shortly after his arrival Mr. Farris directed Mr. Rodes to go to the Citizens' National Bank and take from his safety deposit box 30 $1,000 bonds of the Standard Gas & Electric Company, 10 $1,000 bonds of Victory Mills Company and 100 shares of the 6 per cent. Preferred stock of the Commonwealth & Southern Corporation, and bring them out to the house, saying: "I want to give these to Mrs. Farris." He further said: "Mrs. Farris will give you my keys at the bank." Mrs. Farris went to the desk, got the keys, and handed them to Mr. Rodes. Mr. Rodes then went up town, saw Mr. Eugene Cook, president of the Citizens' National Bank, and told him of Mr. Farris' request. He then opened the deposit box and found in the box, besides other securities, the 10 Victory Mills bonds, the 100 shares of Comonwealth & Southern Preferred, but only 21 of the Standard Gas & Electric Company bonds; the other nine bonds having been put up as collateral on a loan due the bank. Then in company with Mr. Cook, Mr. Rodes returned to the Farris home with the bonds and stock which he had taken from the box. Mr. Farris, in the presence of Mr. Cook and Mr. Rodes, handed to Mrs. Farris the bonds and the stock certificates which he indorsed with a pencil. Mrs. Farris took the bonds and stock certificates, and gave her safety box key to Mr. Rodes, with the request that he place the securities in the box. Neither at the time he told Mr. Rodes to go for the securities, nor at the time of their delivery to Mrs. Farris, was anything said about the marriage contract. The total market value of the securities delivered to Mrs. Farris by Mr. Farris on November 19, 1934, was $15,745. Mr. Rodes ex-

plained to Mr. Farris that the 9 other Standard Gas & Electric bonds were in possession of the Citizens' National Bank as collateral security for a $4,000 loan. After the removal of the securities delivered to Mrs. Farris, there remained in Mr. Farris' lock box 400 shares of the Commonwealth & Southern 6 per cent. Preferred, 200 shares of Louisville Gas & Electric Class A stock, 100 shares of Standard Gas & Electric 7 per cent. Preferred, 100 shares of Kentucky Rock Asphalt Preferred, and 100 shares of St. Louis Public Service Company Preferred, and some jewelry and silverware.

After the delivery of the securities to Mrs. Farris, Mr. Farris began to discuss with Mr. Cook what disposition he desired to make of his remaining property. In the conversation he manifested a desire to help Cowan Jesse complete his education at Georgetown College, and the further desire to make an additional contribution to the Lexington Avenue Baptist Church, and to give to his nephew, Maurice J. Farris, 100 shares of Standard Gas & Electric Preferred. On being told that his oral directions could not be carried into effect, Mr. Farris was asked if he desired to make a will. He replied in the affirmative, and Mr. Rodes then took a pencil and wrote out a will. By the will he devised to the Citizens' National Bank of Danville, as trustee for Cowan Jessee, 200 shares of Louisville Gas & Electric Class A stock, with the provision that the income was to be used for the benefit of Cowan Jesse until he completed his education at Georgetown College, and the stock should then go to the Trustees of the Lexington Avenue Baptist Church in fee. The will also contained certain bequests of jewelry and silverware. The will was then signed by Mr. Farris, and witnessed by Mr. Cook, Mrs. Farris, and Mr. Rodes. Messrs. Cook and Rodes then left the Farris home, and the securities which had been delivered to Mrs. Farris were put in the safety box at the bank by Mr. Rodes. After the execution of the first will it was discovered that, through an error or misunderstanding of some one, the devise in trust had specified Standard Gas & Electric Preferred, instead of Louisville Gas & Electric Class A stock. Upon this discovery Mr. Rodes drafted a second will making the correction. In the meantime Judge Maurice J. Farris, the nephew of Mr. Farris, met Mr. Rodes and stated that Mr. Farris wanted to give him

100 shares of Standard Gas & Electric Preferred. Mr. Rodes was then leaving for Stanford, and went into the Citizens' National Bank and told Mr. Cook to go and see Mr. Farris in person and ascertain his wishes. However, Mr. Rodes and Mr. Cook opened Mr. Farris' box and took out of it a certificate for 100 shares of Standard Gas & Electric Preferred for the purpose of delivering same to Judge Maurice J. Farris, when told to do so by Mr. M. J. Farris. Through inadvertence Mr. Cook replaced the stock certificate in the safety box, and the vault door having been later locked with the time lock, he was unable to take the certificate to the home of Mr. Farris. However, Mr. Cook went to the Farris home that afternoon, and Mr. Farris told him that he wanted to give the 100 shares of Standard Gas & Electric Preferred stock to his nephew, Judge Farris. When Mr. Rodes returned to Danville late that afternoon, he, together with Mr. Cook, Mr. Reynierson, and Judge Farris, went out to the Farris home. Mr. Cook informed Mr. Farris that he had locked up the Standard Gas & Electric Company stock certificate, and did not bring it with him. The will which had theretofore been prepared was read to Mr. Farris, and Mr. Rodes asked Mr. Farris if he wished to give the 100 shares of Standard Gas & Electric Company Preferred to Judge Farris. Mr. Farris nodded his head, and Mr. Rodes inserted the bequest in the will. Mr. Farris then signed the will, and it was witnessed by Messrs. Cook and Reynierson. Mr. Farris died about 24 hours later.

The will was duly probated, and Mr. Rodes qualified as executor. Thereupon the executor brought suit in the Boyle circuit court to settle the estate, and to obtain the advice of the chancellor. The questions involved were appropriately raised, and on final hearing it was adjudged that the securities delivered to Mrs. Farris, which had a market value on the date of delivery of $15,745, were not a gift, but were intended by Mr. Farris to be delivered to Mrs. Farris as a credit and payment on the antenuptial contract. It was further adjudged that the marriage contract be credited with $5,112.50, by reason of the delivery to Mrs. Farris on July 8, 1935, of 100 shares of Commonwealth & Southern Preferred. It was also adjudged that the 100 shares of Standard Gas & Electric 7 per cent. Preferred was the property of Maurice J. Farris, Jr., by virtue of a gift and delivery thereof by the testator on the day

prior to his death, and also under the provisions of his last will and testament. The appeal challenges the propriety of the judgment.

In support of the position that the chancellor erred in his conclusion counsel for appellants present the following argument: In his conversation with Mr. Rodes, M. J. Farris did not mention or refer to the marriage contract in any way. On the contrary, he stated that he wanted to give the securities to Mrs. Farris. He followed this up by delivering the securities to her. Moreover, the fact that he did not bequeath anything to his wife shows that the transfer of the securities was a gift to her. It is also pointed out that, where a testator, who is indebted, bequeaths to his creditor a legacy, the general rule is that, where the legacy is equal to or exceeds in amount the debt due, it is deemed the satisfaction of the debt, but the rule does not prevail where the legacy is of less amount than the debt, even as a satisfaction pro tanto; nor where there is a difference in the times of payment of the debt and of the legacy; nor where they are of a different nature as to the subject matter; nor where there is an express direction in the will for the payment of debts. Cloud v. Clinkinbeard's Ex'rs, 8 B. Mon. 397, 48 Am. Dec. 397; Lisle v. Tribble, 92 Ky. 304, 17 S. W. 742; Buckner's Adm'r v. Martin, 158 Ky. 522, 165 S. W. 665, L. R. A. 1915B, 1156; McMillan v. Massie's Ex'r, 233 Ky. 808, 27 S. W. (2d) 416. Therefore, it is claimed that, if Mr. Farris had not transferred the bonds and stocks to Mrs. Farris before his death, but had bequeathed them to her by his will, then Mrs. Farris would have been entitled to have her marriage contract performed, and also would have been entitled to her rights as legatee under the will. It is also claimed that the same rule should apply where there is a gift inter vivos instead of a bequest. The argument is ably pressed, but the rule as applied to wills is not always applicable, regardless of the circumstances. On the contrary the rule of satisfaction or nonsatisfaction of a debt by a legacy to the creditor is merely a rule of construction, giving rise to a presumption, and yields to the intention of the testator when otherwise ascertainable, since the intention of the testator must prevail in all cases. Thus in Alerding v. Allison, 31 Ind. App. 397, 68 N. E. 185, it was said the deficiency of assets requires that a legacy be construed as a satisfaction. So, too, in Rubert v.

Rubert, 126 Mich. 589, 85 N. W. 1118, the insufficiency of assets to pay both debts and legacies was a circumstance considered as tending to show a satisfaction was intended, and in Eastwood v. Vinke, 2 P. Wms. 613, 24 Eng. Reprint, 883, it was said that a devise by a husband to his wife of land of the yearly value of £88 might go toward satisfaction of a bond given by him on marriage to settle lands of the yearly value of £100 on her for life, if there was not enough to answer the rest of the charges laid on the land, because otherwise the testator's will would be disappointed. After all the question resolves itself into one of intention: Did M. J. Farris intend to make his wife a present of the securities, or did he intend to deliver them in satisfaction of his liability to her? Apparently at the time of his conversation with Mr. Rodes, M. J. Farris had no intention of making a will. The making of a will did not occur to him until he began talking about the disposition of the remainder of his property, and the suggestion came from Mr. Cook. The word "give" does not always mean to make a present of. It may mean to turn over, or deliver something to another. It is not claimed that Mr. Farris' mind was affected, or that he did not understand the nature and value of his estate. He knew of his obligation to his wife. All of his securities were worth less than his liability to her. If he had intended the securities as a gift, he put it out of his power to carry out the marriage contract, and likewise put it out of his power to do anything for his favorite nephew, Judge Farris, or for Cowan Jesse, in whose education he was interested, for the indebtedness under the marriage contract would have taken precedence over any gift or bequest that he might make to either. In the light of these facts we are constrained to take the following view. M. J. Farris knew of his obligation under the marriage contract. At that time he did not intend to make a will. What took place between him and Mrs. Farris we are not permitted to know. He wanted in good faith to carry out the contract. Instead of having his wife file a claim against his estate, he determined to carry out the contract himself. He sent for the securities and delivered them to his wife. If he did not intend them in satisfaction of his obligation, then everything else he did was meaningless and to no purpose.

But the doctrine of estoppel is invoked. The argument is that Mr. Farris unequivocally denominated the

transfer to his wife of the bonds and stocks, a portion of which was highly speculative, as a gift, and she, without any intimation that they were intended in satisfaction of the marriage contract, and without opportunity to decide whether she would accept the securities as a partial performance of the contract, accepted them as a gift. In the circumstances Mr. Farris, if alive, would be estopped to give the transaction an entirely different signification, and for the same reason the beneficiaries of his estate are likewise estopped. The argument assumes that the use of the word "give" necessarily implied that Mr. Farris was making his wife a present of the securities, and for the reasons above stated we are not inclined to agree with the assumption. Not only so, but the acceptance of the securities as a satisfaction pro tanto did not bind Mrs. Farris to retain them as an investment, but she had a right to dispose of them whenever she saw fit. We therefore conclude that there is no element of estoppel in the transaction, considered as a whole.

Lastly it is insisted that the court erred in crediting Mrs. Farris' claim with $5,112.50 by reason of the delivery to her on July 8, 1935, of 100 shares of Commonwealth & Southern Corporation Preferred, instead of only $2,985, the market value of the shares on the day Mr. Farris died. On the death of Mr. Farris there were no bonds on hand with which to satisfy the balance due under the marriage contract. In the circumstances the balance was payable in cash at the option of the executor. Mrs. Farris elected to accept from the executor on July 8, 1935, 100 shares of Commonwealth & Southern Preferred as a credit on the claim. At that time the stock had a cash value of $5,112.50. It was worth that much in cash, and could have been disposed of by the executor and the cash paid instead of turning over the stock. The chancellor allowed Mrs. Farris 6 per cent. interest on the cash value of the stock from December 20, 1934, until July 8, 1935, because she was entitled to the satisfaction of her claim 30 days after November 20, 1934, under the marriage contract. As there was nothing in the marriage contract requiring that the stock should be credited as of its value on the date of the death of Mr. Farris, we conclude that the judgment crediting its value as of the time of its delivery, and allowing interest on such value from December 20, 1934, worked substantial justice between the parties.

474

We come next to that part of the judgment upholding the gift of 100 shares of Standard Gas & Electric 7 per cent. Preferred to Judge Maurice J. Farris. To constitute a "gift inter vivos," the donor's purpose to make the gift must be clearly and satisfactorily established, and must be completed by actual, constructive, or symbolical delivery, without power of revocation, and must take immediate effect. Reynolds v. Thompson, 161 Ky. 772, 171 S. W. 379. M. J. Farris, the donor, indicated his intention to make a gift to his nephew, and identified the property he wished to give. As the stock was not in his house, but was in his safety deposit box at the bank, he could not deliver it in person. He surrendered the key to the box either to Mr. Rodes or to Mr. Cook, and told Mr. Cook to take the stock certificate out and deliver it to his nephew. The certificate was taken out of the box, but by mistake was locked up again and the vault could not be opened in time to make the delivery to the nephew that day. His nephew had been informed of the gift, and had indicated his willingness to accept by telling Mr. Rodes of his uncle's intention. When told that the stock was locked up, Mr. Farris repeated his desire to make a gift of the stock to his nephew and never demanded the return of the key. In the light of all that occurred, it cannot be doubted that Mr. Farris parted with all dominion and control over the stock, and constituted Mr. Rodes and Mr. Cook trustees for his nephew, and the symbolical delivery to them and their acceptance on behalf of the nephew were sufficient to complete the gift. Goodan v. Goodan, 184 Ky. 79, 211 S. W. 423.

Judgment affirmed.

Whole court sitting.