## York's Ancillary Adm'r v. Bromley et al.

Feb. 28, 1941.

534

Woods, Stewart & Nickell and Chesley A. Lycan for appellant.

S. S. Willis and C. Fred See, Jr., for appellees.

OPINION OF THE COURT BY SIMS, COMMISSIONER—Affirming in part and reversing in part.

Dr. L. H. York died testate on Sept. 19, 1935, at the age of 84, leaving a widow, Mrs. Pamelia G. York, 80 years of age, a son, Charley York, 48 years of age, and a daughter, Mrs. Mary Bromley, whose husband, Dr. A. W. Bromley, had been associated with Dr. York in the practice of medicine. Dr. York was a man of considerable property and his will executed on Feb. 21, 1922, provided for the payment of $40 per month to his widow and directed that the balance of his property be divided equally between his two children. The will further provided that if it took more than $40 per month for the maintenance in comfortable circumstances of Mrs. York, such additional sum should be supplied in equal amounts by the two children; that any gifts he had made his children, or in the future might make them, should not be charged as advancements.

Charley York was addicted to the use of liquor and appears not to have been engaged actively in business but assisted his father in the management of his rather large estate. Dr. York operated the River View Hospital in Louisa, was vice-president of the Louisa National Bank, also vice-president of the Louisa-Fort Gay Bridge Company, and was an extensive lender of money in both Kentucky and West Virginia. He paid Charley a salary of $75 per month for his services and in addition thereto gave him large sums of money and several pieces of real estate. Dr. York retired from the practice of medicine and surgery in 1932, at the age of 80, leasing his hospital to Dr. J. E. Carter, and from that time Charley took greater charge of his father's business and he alone had the combination to Dr. York's safe. In the spring of 1933, Charley bought a farm for $12,500 cash in Hightown, Va., which money he received from his father. Soon thereafter he moved to this farm with his family, making periodic visits to Louisa to attend to business for his father. There is testimony that Dr. York would complain at times that he did not have the combination to his safe and had to wait until Charley would return from Virginia before he could get his papers therefrom—that he was going to take a hammer and break the combination.

When the will was probated, Charley had in his possession certificates for 36 shares of stock in the Louisa-Fort Gay Bridge Company (hereinafter referred to as the stock), claiming it was a gift from his father on Jan. 4, 1927, by assignments on the back of the certificates accompanied by a delivery thereof. Mrs. Bromley claimed this stock as a gift from her father by a formal writing he executed and delivered to her on Nov. 30, 1934, which was recorded in the Lawrence County Court Clerk's office on Dec. 1, 1934, wherein he assigned the stock to her. Mrs. Bromley asserted title to the hospital property by virtue of a deed executed and delivered to her by her father on Nov. 29, 1934, which was recorded in the Lawrence County Court Clerk's office on Dec. 1, 1934; also, Mrs. Bromley claimed $1,500 in Home Owner Loan bonds (hereinafter referred to as the bonds), and a great number of notes having a face value of some $10,000 as a gift from her father about one year before his death.

J. L. Moore, administrator with the will annexed of

the estate of Dr. York, instituted this action against the widow, the two children, and the Bridge Company, setting up the claim of each child to the above property and asking the court to adjudge it belonged to neither but to the estate. The administrator further alleged Charley was indebted to the estate for large sums of money advanced to him; that the attempted renunciation of the will by the widow was improperly executed, and as the time had expired for a proper renunciation to be filed, she must take under the will; also, he sought the advice **of the chancellor** in handling the estate. That paragraph of the administrator's petition which attacked the deed to Mrs. Bromley to the hospital property was stricken on motion, since an administrator cannot question a conveyance of real estate.

By an answer and counter-claim Mrs. Bromley set up her claim to the stock, the bonds and the notes; she further alleged Charley was largely indebted to the estate and should be required to account therefor. Charley in an answer and counter-claim, as amended, pleaded his title to the stock by gift from his father and that the bonds and notes were the property of the estate. In reply to the answer of Mrs. Bromley, Charley denied the allegations of her answer, and in answer to her cross-petition alleged his father did not possess sufficient mental capacity to enable him to make a gift of the stock, the bonds and the notes to Mrs. Bromley, or to convey the hospital property to her, and that he did so as a result of undue influence and coercion upon her part. The issues were completed by a rejoinder and reply filed by Mrs. Bromley, since the widow filed an answer admitting she was compelled to take under the will. After Charley and his children had testified, Charley died and the action was revived in the name of Chesley A. Lycan, his ancillary administrator.

Appellee says the reply of Charley properly pleaded want of mental capacity and undue influence relative to the transfer of the stock, but contends that Dr. York's deed to the hospital and the gift of the bonds and notes cannot be attacked in a reply, citing Section 98, Civil Code of Practice; Rosa v. Nava, 235 Ky. 574, 31 S. W. (2d) 910; Spiess' Adm'x v. Bartley, 130 Ky. 277, 113 S. W. 127; Slone v. Kelley, 143 Ky. 135, 136 S. W. 138. But appellee loses sight of the fact Charley's reply did not plead the Doctor's lack of capacity or that undue

influence was exerted upon him; such matter was pleaded in Charley's answer to Mrs. Bromley's cross-petition, and was 'a proper defense to incorporate in the answer.

The case was referred to the master commissioner and after hearing a vast amount of proof on the several issues raised by the pleadings he reported to the court. The commissioner found Dr. York had mental capacity to execute the papers attacked (there was no evidence introduced on the subject of undue influence); that Charley had never accepted the transfer of the stock and his father revoked the gift and gave the stock to Mrs. Bromley. He further found the Doctor had given the bonds and the notes to Mrs. Bromley; that Charley was not indebted to the estate, as all sums he had received were gifts from his father. Exceptions filed by Mrs. Bromley to the entire testimony of Charley and the widow were sustained as were exceptions filed by Charley to the entire testimony of Mrs. Bromley and her husband. The seventeen exceptions filed by Charley's administrator to the commissioner's report were overruled, and the judgment of the chancellor confirmed the report in all respects and judgment was entered accordingly.

Charley's administrator prosecutes this appeal from so much of the judgment as decreed the title to the stock was in Mrs. Bromley; also, he filed a motion in this court seeking the right to prosecute an appeal for the use and benefit of his father's estate from that part of the judgment decreeing Mrs. Bromley to be the owner of the bonds and notes. He alleged in his motion Dr. York's administrator had refused to prosecute the appeal and that Charley's estate had a direct interest in the estate of his father. That motion is sustained inasmuch as Charley's estate is directly interested in his father's estate and Charley's administrator has the right to obtain a final decision as to whether or not Mrs. Bromley or the Doctor's estate owns the bonds and notes.

Neither Charley nor his sister, Mrs. Bromley, were competent witnesses to testify for themselves as to any transactions or conversations had with their father, Section 606, Subsection 2, Civil Code of Practice. However, such testimony of either of them as did not relate to transactions or conversations with their deceased

father was competent. None of Dr. Bromley's testimony was competent as Section 606, Subsection 1, Civil Code of Practice, before the 1940 amendment, Acts 1940, Chapter 95, forbade the husband or wife to testify for or against the other except in certain instances with which we are not here concerned. Charley was a competent witness to testify that he had possession of the stock since Jan. 4, 1927; that he kept it at his home and it had never been out of his possession since he acquired it. Likewise, Mrs. Bromley was a competent witness to the fact she had possession of the bonds and the notes at her father's death. Such testimony does not relate to any transactions or communications between them and their deceased father, therefore it is not prohibited under Subsection 2 of Section 606 of the Civil Code of Practice. Jones v. Driver, 282 Ky. 82, 137 S. W. (2d) 729. But neither of them could testify their father gave them the respective papers they had in their possession as that would be in violation of the code provisions just mentioned.

Mrs. Pamelia York, the widow of Dr. York, and the mother of Charley and Mrs. Bromley, testified that on Jan. 4, 1927 (Dr. York's birthday), her husband called her to his hospital and indorsed the stock certificates to Charley. She signed as a witness to his signature and Doctor gave the stock to Charley, who then and there took possession of it. The chancellor erred in sustaining exceptions to Mrs. York's testimony. She was not testifying for herself against her husband's estate and she had no interest in this litigation, as the only interest she had in the estate was the $40 monthly income fixed by the will. Nor is her testimony that she saw her husband sign the transfers on the back of these stock certificates concerning facts coming to her knowledge by virtue of the marriage relation, but are facts any one could have known or seen who might have been present. Hughes v. Bates' Adm'r, 278 Ky. 592, 129 S. W. (2d) 138; Jones v. Driver, 282 Ky. 82, 137 S. W. (2d) 729. The Jones case is strikingly similar to the one at bar.

It was contended by Mrs. Bromley that her father's signature to the indorsements on the stock certificates transferring them to Charley was not genuine. The experts who testified as to the genuineness of Dr. York's signature stated that Charley's name appeared as assignee in the indorsements on the certificates. The com-

missioner's report, which was confirmed by the chancellor, recited that the evidence on this question was about equiponderant, and as there was no testimony that Charley had accepted the transfer of this stock, Dr. York had a right to revoke his gift to Charley and give the stock to his daughter. But the commissioner and the chancellor erred when they held Charley did not accept the gift of the stock. Mrs. York testified when Dr. York indorsed the stock and she witnessed his signature he handed it to Charley, who took possession of it. Charley testified it was never out of his possession after he took possession of it, and his son, L. H. York (who gave his deposition before his father died), testified that in 1933 he saw this stock in his father's trunk while looking at a coat of arms, and the certificates contained the names of his grandfather and his grandmother York. Robert Dixon, the treasurer of the Bridge Company, testified that four or five years before Doctor's death (or it could have been six years, or even longer, so he testified), the old gentleman brought this stock to him complaining he was not receiving the full amount of dividends to which he was entitled. Dixon first stated he did not see any indorsement on the certificates, and his next answer was, "No, I did not notice that part of it" (referring to the indorsement). Such indefinite and uncertain testimony as that given by Dixon is not sufficient to overcome the clear and direct testimony of Mrs. York, Charley, and his son, L. H. York. The occasion to which Dixon refers must have been prior to the assignment of the stock by Doctor to Charley on Jan. 4, 1927. J. D. York, an illegitimate son of Doctor, testified he saw Charley with these stock certificates in Kenova in 1927 and they were not indorsed; later he saw Charley with them in Hightown, Virginia, in 1936 and they were indorsed. But little confidence can be placed in this testimony as he is a wayfarer and admits that he would tell his father any sort of big tale to obtain money from him.

A "gift inter vivos" is a completed or executed gift which takes effect and is completed by actual, constructive or symbolic delivery without right of revocation with the donee accepting and the donor parting with all title or control over the object of the gift. 28 C. J. 621, Section 5; Farris v. Farris, 269 Ky. 466, 107 S. W. (2d) 299; Foxworthy v. Adams, 136 Ky. 403, 124 S. W. 381, 27 L. R. A., N. S., 308, Ann. Cas. 1912A, 327; Mc-

Coy's Adm'r v. McCoy, 126 Ky. 783, 104 S. W. 1031, 31 Ky. Law Rep. 1189. There is only one question arising as to whether or not this was a gift inter vivos; was the gift defeated by Charley not having the stock transferred to him on the books of the Bridge Company and by permitting his father to draw the dividends on the stock and serve as a director as long as he lived? An assignment duly executed on the back of a stock certificate followed by an unqualified delivery to the assignee operates as a transfer of the stock between the parties, and it is not necessary that the assignee have the stock transferred on the books of the corporation to complete the transaction in so far as it concerns the parties themselves. Biehl v. Biehl's Adm'x, 263 Ky. 710, 93 S. W. (2d) 836; Denunzio's Receiver v. Scholtz, 117 Ky. 182, 77 S. W. 715, 25 Ky. Law Rep. 1294, 4 Ann. Cas. 529; Re Connell's Estate, 282 Pa. 555, 128 A. 503, 38 A. L. R. 1362. See annotations 38 A. L. R. 1366. The reservation by the donor during his life of the dividends on the stock did not destroy the validity of this gift. 24 Am. Jur. 746, Section 29; 12 Fletcher's Cyc. Corps. 969, Section 5685; Re Chapple's Estate, 332 Pa. 168, 2 A. (2d) 719, 121 A. L. R. 422; Calkins v. Equitable Bldg. & Loan Ass'n, 126 Cal. 531, 59 P. 30; Beaumont v. Beaumont, 3 Cir., 152 F. 55; Bone v. Holmes, 195 Mass. 495, 81 N. E. 290; McNally v. McAndrews, 98 Wis. 62, 72 N. W. 315. See annotations 121 A. L. R. 426.

The fact that Dr. York did not make known to the corporation the gift of this stock to his son and that he continued to serve as a director and an officer of the corporation did not prevent the completion of the gift. Sections 545 and 546, Kentucky Statutes, providing the shares of stock of the corporation must be transferred on its books are for the protection of the corporation only. Thurber v. Crump, 86 Ky. 408, 6 S. W. 145, 10 Ky. Law Rep. 59; BancoKentucky Co. v. Weil, 258 Ky. 243, 79 S. W. (2d) 977, and authorities therein cited. So far as the corporation was concerned, the transfer of this stock was not effective until its records reflected that fact, but as between the parties it was complete when the Doctor signed the transfers on the back of the stock certificates and delivered them to his son with the intention to make him a gift thereof.

Counsel for Charley argue that there is no testimony except that offered by Mrs. Bromley and her hus-

band, Dr. Bromley (both of whom were incompetent to testify on the subject), that Dr. York gave the notes and bonds to his daughter. They are in error relative to the notes, Mr. C. F. See, an attorney to whom Dr. York had turned over these notes for collection, in testifying concerning the Doctor taking them out of his hands and asking him (See) if he got mad, stated: "He (Dr. York) said, no, that wasn't what he meant; said he gave the notes to Mary" (Mrs. Bromley). This direct testimony, supported by her possession of the notes, is sufficient to establish a gift of them to her. However, we find no competent testimony in the record that the Doctor gave her the bonds, and the mere possession of the bonds by her, or that she may have sold them during her father's life and kept the proceeds, is not sufficient evidence of a gift, as this is not inconsistent with her custody of them as her father's agent. Especially is this true where such a confidential relationship existed between Mrs. Bromley and her father that during the last years of his life she largely had the management and control of his personal estate. 28 C. J. 679, Section 83 (2); Downing v. Whitlow, 211 Ky. 294, 277 S. W. 262; Hays' Adm'rs v. Patrick, 266 Ky. 713, 99 S. W. (2d) 805; Bell's Ex'r v. Lawrence, 272 Ky. 439, 114 S. W. (2d) 517; Nolty v. Fultz, 277 Ky. 49, 125 S. W. (2d) 749.

While there is much contrariety in the record relative to Dr. York's mental capacity at the time he made the gift of the notes to his daughter, the chancellor found he had sufficient mental capacity to make such gifts. Upon a review of the evidence we are unable to say that the finding of the chancellor was contrary to the preponderance of the evidence. Therefore we are without authority to disturb it. Bell's Ex'r v. Lawrence, supra. But the chancellor's finding on the question of whether or not Dr. York's signature was genuine on the transfer indorsed on the back of the stock certificates is a different question. The commissioner's report (which the chancellor confirmed) states the evidence is equiponderant on this question of signature and the thing which tipped the scales and convinced them the signature was not genuine was that Dr. York, in their judgment, would not part with the stock without retaining the dividends. They lost sight of the fact Doctor did retain the dividends. But the commissioner and the chancellor erroneously excluded the testimony

of Mrs. Pamelia York, who testified she saw her husband sign his name to each assignment and she witnessed it. Where the expert testimony is about equally divided, as in this instance, the direct and positive testimony by an intelligent and disinterested witness, such as Mrs. York, that she saw her husband sign the transfers and then affixed her signature thereto as a witness, is controlling. There is no doubt in our minds that had the commissioner and chancellor considered this testimony of Mrs. York, they would have found the signature of Dr. York on the assignments to be genuine.

So much of the judgment as adjudged the bridge stock and the bonds to Mrs. Bromley is reversed with directions to enter a judgment decreeing the administrator of Charley to be the owner of the bridge stock and decreeing Dr. York's administrator shall recover of Mrs. Bromley the amount she received from the sale of the bonds with 6 per cent interest thereon from the time she converted them to her own use. That part of the judgment adjudging that Mrs. Bromley took the notes as a gift from her father is affirmed.

Judgment affirmed in part and reversed in part.