Martha M. PETRI, Administratrix with the Will Annexed of the Estate of Leo F. Petri, also known as Leo Petri, deceased

v.

Minnie RHEIN, The Northern Trust Company, a corporation, Union Carbide and Carbon Corporation, a corporation, Great Lakes Dredge & Dock Company, a corporation, Fitz Simons & Connell Dredge & Dock Company, a corporation.

No. 54 C 144.

United States District Court
N. D. Illinois.

Sept. 18, 1957.

Judgment Affirmed June 27, 1958.
See 257 F.2d 268.

I. Harvey Levinson, Melvin E. Levinson, Chicago, Ill., for plaintiff.

McCarthy, Toomey & Reynolds, Chicago, Ill., for defendant.

JULIUS J. HOFFMAN, District Judge.

The plaintiff, Martha M. Petri, Administratrix with the Will Annexed of the Estate of Leo F. Petri, deceased, has brought this action for a declaratory judgment as to the ownership of certain shares of corporate stock currently in the possession of the defendant, Minnie Rhein.

The three corporations which issued the stock involved in this suit—Union Carbide and Carbon Corporation, Fitz-Simons & Connell Dredge & Dock Company and Great Lakes Dredge and Dock Company—as well as The Northern Trust Company, which held some of the stock involved as collateral for loans, were also named as defendants in this action. However, on a motion to dismiss agreed to by all parties, an order of dismissal was entered at the commencement of the trial with respect to these corporations.

Jurisdiction is based upon diversity of citizenship. The plaintiff is, and the decedent was, a resident of the State of Wisconsin. The defendant, Minnie Rhein, is a resident of the State of Illinois. The amount in controversy exceeds, exclusive of interest and costs, the sum of $3,000. The case was tried to the court without a jury.

The plaintiff claims the stock in question as a part of the estate of Leo Petri. The defendant, on the other hand, alleges that she and the decedent held the stock during the latter's lifetime as joint tenants with right of survivorship and that upon the death of the decedent she became the sole owner of the stock.

In resolving the questions raised in this action, the stock with which the case deals has been separated into two groups:

(1) The first block consists of the following shares which were originally owned by Leo Petri but which were subsequently transferred by him to Minnie Rhein and himself as joint tenants with right of survivorship.

| Corporation | Shares | Date of Transfer |
|---|---|---|
| Union Carbide and Carbon Corporation (hereinafter called Union Carbide) | 400 | July 31, 1948 |
| Union Carbide | 150 | March 17, 1950 |
| Fitz Simons & Connell Dredge & Dock Company (hereinafter called Fitz Simons & Connell) | 305 | March 17, 1950 |

(2) The second block consists of 340 shares in the Great Lakes Dredge and Dock Company. The certificates for these shares were issued on December 21, 1949, in the names of Leo Petri and Minnie Rhein as joint tenants with right of survivorship and were never in the name of Leo Petri alone.

## I.

### Union Carbide and Fitz Simons & Connell Stock

The plaintiff challenges the validity of the transfers of the Union Carbide and Fitz Simons & Connell stock by Leo Petri to Minnie Rhein and himself as joint tenants, contending (a) that the common-law unities of time and title required for the creation of joint tenancies were not satisfied and (b) that the donative intent and surrender of dominion and control required for a valid gift of personal property were lacking.

Inasmuch as the plaintiff's contentions concern the validity of stock transfers, an initial question is presented with respect to the Union Carbide shares as to whether these issues should be resolved in accordance with the law of the place of the transfers involved (Illinois) or the law of the corporation's domicile (New York). In regard to the Fitz Simons & Connell stock, no such question arises, since Illinois is both the place of transfer and the state of incorporation.

On the basis of cases decided under the doctrine of Erie R. Co. v. Tompkins, 1938, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188, the question regarding the Union Carbide stock is to be decided in accordance with applicable Illinois rules on conflict of laws, Klaxon Co. v. Stentor Elec. Mfg. Co., 1941, 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477; Griffin v. McCoach, 1941, 313 U.S. 498, 61 S.Ct. 1023, 85 L.Ed. 1481, or, in the absence of such rules, from an independent determination based upon an examination of other authorities, Linkenhoger v. Owens, 5 Cir., 1950, 181 F.2d 97, McClaskey v. Harbison-Walker Refractories, 3 Cir., 1943, 138 F.2d 493.

An examination of Illinois authorities has failed to disclose any relevant decisions on the choice of laws question here presented. However, cases decided elsewhere on this point uniformly draw a distinction between the transfer of stock *certificates* and the transfer of the *shares* represented thereby: The validity of transfers of title to certificates is held to be governed by the law of the place where the certificates are transferred, Direction der Disconto-Gesellschaft v. United States Steel Co., 1925, 267 U.S. 22, 45 S.Ct. 207, 69 L.Ed. 495; Warner v. Florida Bank & Trust Co., 5 Cir., 1947, 160 F.2d 766; Pennsylvania Co. etc. v. United Rys., D.C.S.D.Me.1939, 26 F.Supp. 379; but the validity of

transfers of title to the shares themselves is held to be controlled by the law of the place of incorporation, United Cigarette Mach. Co. v. Canadian Pac. Ry., 2 Cir., 1926, 12 F.2d 634; Morson v. Second Nat'l Bank, 1940, 306 Mass. 588, 29 N.E.2d 19, 131 A.L.R. 189. The law of the place where a certificate is transferred will also govern the transfer of the shares themselves, if the law of the corporate domicile provides that transfer of the certificate also accomplishes transfer of the shares. Direction der Disconto-Gesellschaft v. United States Steel Co., supra; Strout v. Burgess, 1949, 144 Me. 263, 68 A.2d 241, 12 A.L.R.2d 939; Beale, 2 Conflict of Laws § 192.4 (1935); Restatement, Conflict of Laws §§ 53, 104.

■ Applying these rules to the facts of this case, Illinois law governs not only the transfer of the Union Carbide certificates, but also the transfer of the shares themselves. This conclusion is based upon the fact that the Uniform Stock Transfer Act, in effect in New York, the place of Union Carbide's incorporation, and the cases decided thereunder, provide that delivery anywhere of a stock certificate of a New York corporation, accompanied by a written endorsement, transfers title to the shares represented by the certificates, as well as to the certificates themselves. McKinney's Consol.Laws, c. 41, Personal Property Law, §§ 162–185; Morson v. Second Nat'l Bank, supra; see also Direction der Disconto-Gesellschaft v. United States Steel Co., supra.

Having concluded that Illinois law governs the disposition of the questions here presented, we now turn to the plaintiff's first contention, that the transfers failed because of lack of the unities of time and title.

■■ A general requirement of Illinois at the time of the transfers in question was that in order to create a valid joint tenancy, there had to be present the common law unities of time, title, interest and possession, that is, the several tenants were required to "have one and the same interest accruing by one and the same conveyance commencing at one and the same time and held by one and the same undivided possession." Hood v. Commonwealth Trust & Savings Bank, 1941, 376 Ill. 413, 423, 34 N.E.2d 414, 420. Under the unities rule, it was held that the unities of time and title, the unities here in question, were lacking where a grantor transferred property to himself and another as joint tenants, for the reason that the grantor traced his title in the property to the original conveyance to himself, while the other tenant traced his title to the purported transfer into joint tenancy.[1] Deslauriers v. Senesac, 1928, 331 Ill. 437, 163 N.E. 327, 62 A.L.R. 511.

■ The defendant maintains, however, that subsection (b) of section 2 of the Illinois Joint Rights and Obligations Statute, Ill.Rev.Stat. c. 76, dispensed with the unities requirements with regard to joint tenancies in corporate stock.[2]

---

1. Subsequent to the transfers here in question, section 2.1 was added to the Illinois Joint Rights and Obligations Statute, Ill.Rev.Stat. c. 76. That section, in effect, abolishes the unities of time and title with respect to joint tenancies in personal property, by providing that a valid joint tenancy may be created although the transferor of property into joint tenancy is also a transferee. The section, however, specifies that it shall not apply to transfers made prior to its effective date, May 14, 1953.

2. Section 2(b) provides as follows: "When shares of stock * * * are or have been issued or registered by any corporation * * * in the names of two or more persons as joint tenants with the right of survivorship, such corporation * * * may, upon the death of any one of such registered owners, transfer said shares of stock * * * to or upon the order of the survivor or survivors of such registered owners, without inquiry into the existence, validity or effect of any such will or other instrument in writing or the right of such survivor or survivors, to receive the property, and without liability to any other person whomsoever who might claim an interest in or a right to receive all or a portion of the property so transferred."

Nevertheless, it is the court's view that the clear language of that subsection shows that it has no relation to the creation of joint tenancies as between the tenants themselves, but rather that it was intended only to limit the liability of corporations with respect to transfers of jointly held stock. The court's position with respect to the question as to whether the unities were in fact satisfied in the transfers here in dispute makes it unnecessary to discuss further the defendant's contentions as to section 2(b) and the cases she cites in support of her theory.

Turning then to the question as to whether the unities of time and title have been satisfied by the transfers in question, it is clear that these requirements have been met. See Hood v. Commonwealth Trust & Savings Bank, supra. In the Hood case, an action was brought to enforce the superadded liabilities of a bank's shareholders. One of the defendant shareholders, Otto E. Lucius, had acquired shares of the bank's stock in February, 1930, which he transferred in March, 1930, to Belle M. Lucius and himself as joint tenants with right of survivorship. The stock certificate originally acquired by Lucius was surrendered to the corporation, and a new certificate was issued in the joint names of Otto and Belle Lucius. In fixing the liability of the defendant, it was held that the transfer by Lucius to his wife and himself started a new period of stock ownership. The court stated:

"To create an estate in joint tenancy it is necessary that there be unity of interest, unity of title, unity of time and unity of possession. * * * [W]hen Otto E. Lucius surrendered the first certificate and caused the second to issue to him and his wife as joint tenants, *he thereby terminated all title in the stock evidenced by the first certificate and thereafter held as a joint tenant with his wife*. To create the joint estate it was essential that his interest as a joint tenant be created at the same time as that of his co-tenant, for if it be otherwise there would be no joint tenancy." 376 Ill. at pages 423–424, 34 N.E.2d at page 420. (Emphasis added.)

Although the question in the Hood case as to whether the transfer met the unities requirement did not arise in the same manner as it has in the instant case, nevertheless that case stands for the proposition that the grantor in such a stock transfer traces his title in the joint property to the conveyance into joint tenancy and not to the original conveyance to himself individually, provided the original certificate held by the grantor alone has been surrendered to the corporation and a new certificate has been issued in the names of the joint tenants. The transfers in the present case were effected in the same manner as those in the Hood case, new certificates having been issued to Leo Petri and Minnie Rhein as joint tenants, after a surrender to the corporation of the certificates originally held in Leo Petri's name alone.

The plaintiff next maintains that, even if these stock transfers met the unities requirement, the transfers were ineffective as gifts.

If the transfers in question are to be sustained, they must constitute valid inter vivos gifts, since there is no claim by the defendant that she gave any consideration for her alleged interest in the stock. In re Estate of Schneider, 1955, 6 Ill.2d 180, 127 N.E.2d 445. To effect an inter vivos gift, the donor must deliver the property to the donee, relinquishing all dominion and control over it, and he must make the delivery with the intention of vesting in the donee a present interest in the property. People v. Polhemus, 1937, 367 Ill. 185, 10 N.E.2d 966; Suchy v. Hajicek, 1936, 364 Ill. 502, 4 N.E.2d 836. The donee must prove by "clear and convincing evidence" that a gift has been made. In re Estate of Schneider, supra; Bolton v. Bolton, 1923, 306 Ill. 473, 138 N.E. 158.

The facts in this case upon which the court must base its determination as to

whether a valid gift was made are not in dispute. They are as follows:

(1) The relationship between the decedent, Leo Petri, and the defendant, Minnie Rhein, was that of uncle and niece. As revealed by the testimony of the defendant, as well as by a letter written by the decedent to a Mr. Cohen (Def.Ex. 3), the decedent had helped to support the defendant and her mother for many years after the death of Minnie Rhein's father in 1908. He helped to pay their rent, purchased clothing for them, gave them many gifts, and paid for his niece's education.

(2) The first transfer involved in this case occurred in July, 1948. At that time, according to the testimony of Minnie Rhein, Leo Petri came to the home of the defendant with a certificate for 500 shares of Union Carbide stock. He said that he wanted her to have 400 shares and wanted to retain 100 shares in his own name. He asked her to sign a joint tenancy agreement with respect to the 400 shares (Pl.Ex. 6A). Then, accompanied by Minnie Rhein, he went to the bank, where he had the signatures verified and delivered the stock to the transfer agent. When the new certificates, in the joint names, were issued, Minnie Rhein called for them at the bank. She placed the joint tenancy certificates, as well as the certificate for 100 shares in the name of Leo Petri, in her safe deposit box. The box was in her name alone. Photostatic copies of the original certificate for 500 shares of Union Carbide in Leo Petri's name, with the endorsement of 400 shares to Minnie Rhein and himself as joint tenants, as well as copies of the certificates issued in joint tenancy, were received as plaintiff's exhibits 6 and 6B–6F.

(3) The second set of transfers, which took place in March, 1950, involved a procedure similar to that described above, except that no joint tenancy agreement relating to these transfers has been introduced into evidence. The defendant testified that on March 17, 1950, she met her uncle at the office of Mr. Madden, who was the decedent's attorney. Negotia-tions for a divorce settlement were being conducted at that time between the decedent and his wife, the plaintiff in this action. Minnie Rhein testified that when she met her uncle at the attorney's office, "My uncle discussed some of the points of the divorce, and then he asked me if I would go to the Northern Trust Bank with him." Leo Petri and Minnie Rhein then went to the bank, where Petri asked Minnie Rhein to remove from her safe deposit box certificates representing 250 shares of Union Carbide stock and 305 shares of Fitz Simons & Connell stock, which certificates were held in the name of Leo Petri only. On obtaining these certificates, Petri endorsed them to Minnie Rhein and himself as joint tenants, and then he and the defendant delivered them to Mr. Wayland, the transfer agent, for purposes of transfer and signature verification. Minnie Rhein testified that the decedent said to Mr. Wayland at that time that "he wanted to transfer the stock to my name, that he was giving them to me. He said he wanted me to have something to live on for the rest of my life." (Tr. 64.) The endorsed certificates were then left at the bank, and when the new certificates were issued Minnie Rhein called for them and placed them in her safe deposit box. Copies of the Union Carbide and Fitz Simons & Connell certificates originally held in the name of Leo Petri, and of the certificates subsequently issued in the joint names (except for a certificate for 100 shares of Union Carbide which was sold in 1951 and is not at issue in this case), were received in evidence as plaintiff's exhibits 1–4B and 7–9A.

(4) The evidence reveals several facts relating to the decedent's exercise of powers pertaining to the stock subsequent to the transfers described above.

(a) In April 1950, certificates representing 200 shares of Union Carbide stock held in the joint names of Leo Petri and Minnie Rhein were pledged as collateral for a loan of $8,000 to Leo Petri. The purpose of this loan was to obtain money for payment of the above-mentioned divorce settlement. Minnie Rhein

testified that she and her uncle went to the bank for the share certificates, which they took to the loan department. She testified, in reply to a question whether she had had any conversation with her uncle as to whether or not she should agree to using the joint tenancy stock as collateral for her uncle's loan, that there had been no such conversation. She stated, "I knew that he needed funds, and I was willing to give it up." (Tr. 71.)

(b) In July, 1951, a certificate representing 100 shares of the Union Carbide stock which had been pledged as collateral for the loan of $8,000, as well as 75 shares of Great Lakes stock held in the name of Leo Petri alone, were sold to liquidate the loan. Minnie Rhein testified that she met her uncle at the bank and that "we decided that I would sell the 100 shares of Union Carbide in joint tenancy and he sold 75 shares of Great Lakes Dredge and Dock Company that was in his name only." (Tr. 72.) She was then asked, "Did he ask you to—how did that come about?" and she replied, "No, I willingly said I would give it because I thought so much of him and I thought that I should do it." (Tr. 51.) The remaining 100 shares of Union Carbide stock pledged for this loan, and not sold for its liquidation, were later returned to the possession of Minnie Rhein.

(5) The evidence also reveals several facts relating to the failure of the defendant, Minnie Rhein, to exercise rights of ownership in the stock in question. Minnie Rhein testified that she did not receive any dividends on the Union Carbide or Fitz Simons & Connell stock before the death of Leo Petri. In fact, the joint tenancy agreement executed in July, 1948, concerning the 400 shares of Union Carbide stock, expressly reserved to Leo Petri the right to receive dividends on the stock covered thereby. In addition, Minnie Rhein testified that she received no communications from and had no correspondence with either of the corporations involved prior to her uncle's death, and that she had no recollection as to whether or not she had signed any "voting slips" during her uncle's lifetime.

Furthermore, the certificate for 100 shares of Union Carbide stock which was pledged for Leo Petri's loan, but not sold for its payment, remained, uncalled for, in the possession of The Northern Trust Company from 1951, when the loan was repaid, until about two months after the death of Leo Petri, in 1953, when Minnie Rhein requested and obtained delivery of the certificate to herself.

(6) Evidence in the form of written statements concerning Leo Petri's reasons for making the transfers in question was introduced by both parties.

(a) The defendant introduced a letter, without objection by the plaintiff, from the decedent to a Mr. Cohen (Def. Ex. 3). The letter stated that the decedent wanted to explain why he had put Minnie Rhein's name on much of his stock. It then described the decedent's relationship with the defendant and her mother and his contributions to their support, indicating the decedent's high regard for his niece.

(b) The plaintiff introduced a letter from the decedent, received over the defendant's objections, for the purpose of explaining the letter to Cohen. This letter (Pl. Ex. 16–16B) is dated November 7, 1950, but contains nothing to show to whom it was written. In this letter, Leo Petri stated that he wanted to explain why his niece's name was on much of his stock and he wrote, "When I started buying stocks, I put her name on them so that she would have them in the event that I died." He further stated that discord had arisen between himself and Minnie Rhein and her mother since his marriage, that Minnie Rhein had recently brought suit to have a conservator appointed to handle his affairs, and that Minnie Rhein and her mother deserved no further assistance from him. Two slips of paper are enclosed in this letter. One lists "450 shares Union Carbide & Carbon Company—in both names," and "305 Fitz Simons & Connell Dredge & Dock Co.—in my name," and states that "These stocks are held by Minnie Rhein for me." The other slip lists, among other stocks, "200 Union Carbide . . . .

—both names," and it states, "These stocks are held by the Northern Trust Bank as collateral for my loan from them." [3]

The question for decision concerns the effect of this evidence upon the issues of whether (1) the donative intent required for an inter vivos gift was present and (2) the required delivery was made.

 *Donative intent.* As stated above, the burden of proof is on the defendant, as the alleged donee, to show by clear and convincing evidence that a gift has been made. With regard to this burden, it was held in Manning v. United States Nat'l Bank, 1944, 174 Or. 118, 148 P.2d 255, 153 A.L.R. 922, that written transfers of stock in themselves constitute sufficient proof of donative intent. Similarly, the Illinois Supreme Court has held, with respect to joint bank accounts, that, in the absence of contrary proof, a written deposit agreement is sufficient evidence of donative intent to support a gift. See In re Estate of Schneider, 1955, 6 Ill.2d 180, 127 N.E.2d 445, reviewing the Illinois decisions on this question. It is clear, under these authorities, that the written instruments of stock transfer from Leo Petri to Minnie Rhein are sufficient proof of the decedent's intent, at the time of the transfers in question, to convey to Minnie Rhein a present interest in the stock involved. In addition, the letter from the decedent to Mr. Cohen referred to above, as well as the testimony of the defendant with regard to the transfers, serves to explain in some degree the motives of the decedent in giving the defendant a joint interest in the stock. Neither the letter nor the testimony was contradicted or impeached by the plaintiff.

The plaintiff contends that the following evidence constitutes contrary proof on the question of donative intent: (1)

the decedent received all dividends on the stock until his death; (2) the defendant allegedly never voted any of the stock during the decedent's lifetime, while presumably the decedent did so; (3) the defendant never received any communications from nor had any correspondence with either corporation, while presumably the decedent did; (4) some of the stock in question was pledged for a loan to the decedent, and part of the stock so pledged was sold in order to repay the loan; (5) the decedent wrote a letter stating that he had put the defendant's name on much of his stock so that she would have it at his death; (6) at the time when some of these transfers were made, the decedent was negotiating with his wife for a divorce settlement; and (7) the defendant never exercised any ownership rights in respect to the stock until after the death of the decedent.

The evidence, the plaintiff contends, indicates that the decedent never relinquished dominion and control over the stock, and also that the defendant did not at any time exercise any rights of ownership therein. Therefore, the plaintiff argues, this evidence establishes the fact that the decedent did not intend to convey a present interest to the defendant at the time of the transfers.

 The court does not approve of this contention. All of the evidence which the plaintiff relies upon as indicating a lack of donative intent, except that relating to the divorce negotiations, concerns events subsequent to the transfers in question. Courts have consistently held that events occurring after the making of a gift, which gift to all appearances was intended to transfer a present interest, can have no effect upon the validity of the gift. A donor is not permitted to impeach his own gift by subsequent conduct or statements.

3. A third letter from Leo Petri (Def. Ex. 4) was also introduced into evidence with regard to the decedent's intent in making the transfers. The defendant suggests that this letter contains evidence with regard to the transfers in question.

The court, however, does not so regard it, inasmuch as it seems to predate any of the transfers here involved and to concern only stock which the decedent transferred to Minnie Rhein and her mother in 1929.

Brightbill v. Boeshore, 1956, 385 Pa. 69, 122 A.2d 38; State ex rel. Shaffer v. Kuthy, Ohio App.1945, 71 N.E.2d 133; Manning v. United States Nat'l Bank, supra; In re Chapple's Estate, 1938, 332 Pa. 168, 2 A.2d 719, 121 A.L.R. 422; Martin v. Martin, 1897, 170 Ill. 18, 48 N. E. 694.

As to the first point relied upon by the plaintiff, it frequently has been held that a gift of stock may occur although the donor reserves the right to receive all dividends thereon. Martin v. Martin, supra; Delta & Pine Land Co. v. Benton, 1912, 171 Ill.App. 635; Stock v. Seegar, 1901, 99 Ill.App. 353; Brightbill v. Boeshore supra; Allender v. Allender, 1952, 199 Md. 541, 87 A.2d 608; State ex rel. Shaffer v. Kuthy, supra; Benton v. Smith, Mo.App.1943, 171 S.W.2d 767; York's Ancillary Adm'r v. Bromley, 1941, 286 Ky. 533, 151 S.W. 2d 28; In re Chapple's Estate, supra. Nor is this rule rendered inapplicable in this case because as to the transfers in March, 1950, no express agreement as to dividends has been shown. In several of the cases cited above it was held that evidence of a present gift was not overcome by the fact that the donor continued to receive dividends, although no express agreement existed concerning the matter. Brightbill v. Boeshore; Allender v. Allender; State ex rel. Shaffer v. Kuthy; York's Ancillary Adm'r v. Bromley; Martin v. Martin, supra. Moreover, this is not a case where evidence of a present gift is lacking; in such a situation, it has been held that the absence of an express agreement, together with the continued receipt of dividends by the alleged donor, tended to show that no present interest had been transferred. See In re Estate of Waggoner, 1955, 5 Ill.App.2d 130, 125 N.E. 2d 154.

As to the further arguments that Leo Petri continued to vote the stock after it was transferred into joint tenancy, and that he handled all correspondence with the companies such circumstances do not show a lack of donative intent. See Brightbill v. Boeshore; Allender v. Allender; In re Chapple's Estate, supra.

The same is true with respect to the plaintiff's fourth argument—that some of the stock involved was used as collateral for a loan to the decedent and that some of the pledged stock was sold to liquidate the loan. See, in this regard, Brightbill v. Boeshore, supra. The defendant's uncontradicted testimony showed that she had been quite willing that the stock be pledged and later sold. Nothing was done with the stock against the defendant's will. It is quite plausible that the defendant did not hesitate to have the stock used in this manner, in view of the fact that the decedent was a joint owner of the stock and that he had bestowed many gifts on the defendant. The relationship between them, practically that of father and daughter, makes it reasonable to believe that Minnie Rhein would have willingly permitted property which Leo Petri had given to her to be used subsequently for his benefit.

The fifth point relied upon by the plaintiff—that the decedent wrote a letter in which he stated that he had placed Minne Rhein's name on much of his stock so that she would have it in the event of his death—can have no effect on the validity of the gift. This statement was made subsequent to transfers which indicated clearly that the certificates were present gifts. Prior and contemporaneous statements showing that a transfer was not meant as a gift are relevant to the question of intent. Nolan v. American Tel. & Tel. Co., 1945, 326 Ill.App. 328, 61 N.E.2d 876. However, subsequent statements cannot contradict the gift. In re Chapple's Estate, supra; Brightbill v. Boeshore, supra. It also may be noted that the statement in the letter may have been selfserving. The letter was written at a time when discord had arisen between the decedent and the defendant. An explanation of the transfers at such a time and subsequent to the transfers seems particularly to deserve little weight.

The next argument made by the plaintiff—that at the time of the 1950 transfers the decedent was negotiating a divorce settlement with his wife, Martha Petri—is the only contention advanced by the plaintiff which bears on the decedent's intent at the time of the transfers in question. The fact that such negotiations were being conducted, however, does not detract from the conclusion that a present gift was intended. Actually, it may supply a motive for making the gifts of 1950, inasmuch as the decedent may have wanted to prevent his wife from obtaining the stock then assigned. In any event, there is no indication that the decedent intended to obtain a return of the stock to his name when the settlement had been made. The plaintiff does not so allege and has suggested no other way in which the fact of the divorce settlement could have a bearing upon the alleged lack of donative intent.

The final point upon which the plaintiff relies—that the defendant did not make any claims of ownership in the stock during the decedent's lifetime—fails to show that a gift was not made. Gifts of stock have been upheld where there was effective proof thereof, even though the donor continued to exercise powers relating to the stock and despite the failure of the donee to assert any ownership rights therein until the death of the donor. See Martin v. Martin, supra; Brightbill v. Boeshore, supra. The plaintiff cites In the Matter of Estate of Whaley, 1954, 3 Ill.App.2d 333, 122 N.E. 2d 46, for the proposition that the failure of a purported donee to assert ownership rights in the property in question indicates that she did not regard a gift as having been made during the donor's lifetime. That case, however, held invalid an alleged gift of a bank deposit on the ground that neither delivery nor intent to make a gift were effectively proved. Although the claimant did have possession of the pass book, the fact that no claim was made thereunder until after the decedent's death was regarded as weighing heavily against the claimant under the circumstances of the case.

Inasmuch as the defendant's evidence proves that the decedent intended to transfer a present interest in the stock to Minnie Rhein, and since the contrary evidence of the plaintiff is insufficient to overcome that proof, the required donative intent was present with regard to the transfers in question.

*Delivery.* The evidence reveals that actual physical delivery of the stock in question was made by Leo Petri to Minnie Rhein, and the plaintiff does not dispute this fact. The plaintiff argues, however, that the delivery was only conditional, in light of the evidence (1) that Minnie Rhein kept in her safe deposit box not only the stock certificates held in joint tenancy but also certificates held in Leo Petri's name alone, and (2) that the defendant gave the joint tenancy certificates to Leo Petri whenever he asked for them.

As to the first circumstance relied upon by the plaintiff, Minnie Rhein's possession of certificates owned solely by Leo Petri does not show that delivery of the joint tenancy certificates was conditional. Such possession has a more logical bearing on the question of intent than on delivery. See Martin v. Martin, supra. Even as bearing on the question of intent, however, such possession can have no effect in the present case since it does not appear that any implications arising from the fact of such possession are sufficient to overcome the proof of intent found in the written instruments of transfer. The court has seen only one decision in which a similar question was considered; that case involved securities which were transferable by delivery alone, without any such written instruments of transfer. See Martin v. Martin, supra.

As to the second circumstance said to show that delivery was conditional—that the defendant gave the certificates to the decedent whenever he requested them—it was held in Martin v. Martin, supra, that a valid gift of se-

curities had been made although the donee returned them to the donor from time to time, at his request. And, too, the record in the present case reveals only one occasion on which the defendant did in fact give the joint tenancy certificates to the decedent. That was the occasion on which some of the certificates were removed from the safe deposit box for the purpose of pledging them as collateral for the bank's loan to Leo Petri. It is clear from the evidence that this use of the certificates was with the consent of the defendant and thus did not give rise to an implication that a present gift had not been made.

Since the evidence shows that actual delivery of the stock was made to Minnie Rhein, and since there is no proof that the delivery was conditional, the required element of delivery of the stock in question has been established.

## II.

### Great Lakes Stock

The second block of stock at issue in this suit consists of 340 shares in the Great Lakes Dredge & Dock Company (herein called Great Lakes) issued on December 21, 1949, in the names of Leo Petri and Minnie Rhein as joint tenants with right of survivorship.

This stock is claimed by the plaintiff as part of the estate of Leo Petri on the ground that Leo Petri did not make a valid gift of an interest in the stock to Minnie Rhein. The plaintiff contends, first, that the delivery required under the Uniform Stock Transfer Act to effect a transfer of title in the shares was not made prior to the death of the decedent, inasmuch as the Great Lakes stock was never in the possession of Minnie Rhein during the lifetime of Leo Petri. The plaintiff argues, secondly, that Leo Petri did not intend to convey a present interest in the stock to Minnie Rhein because (1) the decedent reserved the right to receive dividends on the stock, (2) the stock was used as collateral for loans from The Northern Trust Company to Leo Petri from the time the

stock was issued until the loans were liquidated in 1951, and (3) the stock thereafter remained in the possession of The Northern Trust Company until two months after the death of Leo Petri in 1953, when it was delivered to Minnie Rhein.

The defendant, on the other hand, claims the stock in question on the ground that she and the decedent both contributed to the purchase of the stock and therefore that her joint interest was created by means of purchase and not by gift.

The plaintiff does not maintain that the estate of Leo Petri has any claim to the stock if, in fact, Minnie Rhein paid for her joint interest therein. Nor does Minnie Rhein contend that if she had not paid for the stock she could claim a valid interest in it by way of gift. Therefore, the sole issue for determination is whether the evidence shows a gift rather than a purchase with respect to the Great Lakes stock. In this regard, the burden is on the plaintiff to prove by a preponderance of the evidence that the stock properly belongs to the estate of Leo Petri. Hogg v. Eckhardt, 1931, 343 Ill. 246, 175 N.E. 382; In re Estate of Jones, 1934, 274 Ill.App. 616.

It is clear that the defendant paid for her interest in the stock in question and therefore that by virtue of right of survivorship she is entitled to retain possession of the Great Lakes stock here involved. The evidence upon which this finding is based is as follows:

The defendant testified that prior to the purchase of the Great Lakes stock in December, 1949, the decedent asked her if she would like to buy some stock with him. She replied that since she had some money she would be glad to do it. She further testified that the decedent then wrote a letter of instructions to The Northern Trust Company with regard to purchase of some stock. This letter was not introduced into evidence because, according to the defendant's testimony, The Northern Trust Company had been unable to locate it. The de-

fendant testified that these instructions stated that she should arrange for purchase of the stock and that title should be taken in joint tenancy with right of survivorship. She also testified that a check of Leo Petri in the amount of $900 was enclosed in the letter.

Minnie Rhein next testified that, pursuant to these instructions, she went to The Northern Trust Company to arrange for the purchase of the stock. On that visit, she stated, Mr. Staley of The Northern Trust Company made certain notations concerning the payments for the stock on a piece of paper, which he gave to her. This paper, allegedly given to the defendant by Mr. Staley, was introduced into evidence as defendant's exhibit 1. It lists as one of the payments, "Cash from Miss Minnie Rhein— $1,022.74." It also lists as received in payment for the stock a check from Leo Petri in the amount of $900 and proceeds of a loan to Leo Petri, after discount, of $3,727.50.

Minnie Rhein testified that she obtained from her savings account with The Northern Trust Company the cash noted above as her contribution. She introduced into evidence as defendant's exhibit 2 her pass book to that account. It shows a withdrawal on December 5, 1949, of $1,087.14.

The plaintiff contends that evidence appearing in the record shows that the defendant did not make the above stated cash payment for the Great Lakes stock. The plaintiff relies on the fact that the record shows that the stock in question was paid for by a cashier's check, rather than by the accumulated sources listed on the paper introduced by the defendant. The record does in fact show that the bank received a cashier's check on December 6, 1949, which it used to pay for the Great Lakes stock. This is revealed in paragraph 8 of the answer of The Northern Trust Company, originally a defendant in this case, which paragraph was stipulated by the parties as part of the facts in this case. However, the evidence relating to this cashier's check does not contradict the notations on the paper produced by the defendant with respect to the payments for the stock. First, the amount of the cashier's check is the same as the total amount shown on the paper as received in payment for the Great Lakes stock. Secondly, paragraph 8 of The Northern Trust Company's answer does not allege that the cashier's check was received from Leo Petri; it merely states that the check was "received" and was used by The Northern Trust Company to pay for the Great Lakes stock. Consequently, it appears that The Northern Trust Company consolidated the various amounts listed on the paper into one cashier's check for purposes of its own convenience. At any rate, the evidence relating to the cashier's check is not inconsistent with the notations on the aforementioned exhibit.

It should be noted that paragraph 8 not only fails to contradict the statement in the exhibit produced by the defendant that a cash payment was received from Minnie Rhein for purchase of the stock, but also that the paragraph in fact tends to corroborate the genuineness of the paper. The transactions with regard to the Great Lakes stock as described in paragraph 8 are consistent in all respects with the figures found in the paper. Thus both prove:

(1) That a loan was made by The Northern Trust Company to Leo Petri of $3,750 (the paper also shows that this loan, less $22.50 which was discounted, was one source of the payment);

(2) That 365 shares of Great Lakes stock were purchased on the order of Leo Petri (paragraph 8 shows that 25 of these shares were registered in the name of Martha Petri, and that 340 shares were registered in the names of Leo Petri and Minnie Rhein as joint tenants with right of survivorship);

(3) That the total cost of the 365 shares was $5,565.39;

(4) That the amount received in payment for the stock was $5,650.24, $84.85 in excess of the cost of the shares;

(5) That $84.85 was applied by The Northern Trust Company on the above loan to Leo Petri of $3,750.

The plaintiff, however, insists that the defendant gave no consideration for her interest in the Great Lakes stock because on February 8, 1956, a deposition of the defendant was taken by the plaintiff, in which the following questions and answers are shown:

"Q. Have you ever purchased any stock yourself prior to the death of Mr. Petri? A. No.

"Q. You never bought any stock yourself? A. No.

"Q. Have you ever paid any money to anyone for any stock? A. No."

When asked during the trial whether she recalled these questions and answers, the defendant testified that she recalled the first two questions and answers, but that she did not recall the third question or answer. After further questioning with regard to the deposition, the defendant stated that while she of course made the above answer to the third question she did not recall the question itself.

Upon being examined by her attorney, the defendant was asked whether she cared to make any explanation with regard to her answers in the deposition. She stated that she would, and testified, "I thought when he asked the question that he meant if I purchased any stock myself instead of purchasing in joint tenancy with my uncle." She was asked, "Up to Mr. Petri's death had you ever personally purchased any stock?" She replied, "No, sir." She was asked, "That is what you meant?" She replied, "That is what I meant, yes."

The defendant's explanation of her answers in the deposition was reasonable. It is clear, also, that the defendant's testimony that she paid $1,022.74 in cash for her interest in the Great Lakes stock, as supported by the evidence reviewed above, shows that such payment was in fact made.

There will be a finding of the issues in favor of the defendant and against the plaintiff with judgment in favor of the defendant at the plaintiff's costs.

The court's findings of fact and conclusions of law are incorporated in the foregoing memorandum of decision in accordance with the provisions of Rule 52(a) of the Federal Rules of Civil Procedure, 28 U.S.C.A.